May it please the Court, I'm Maura Monaghan and I'm here on behalf of Defendant Appellant Medicredit, Incorporated. The District Court erred in certifying this case alleging violations of the Fair Debt Collection Practices Act as a class action. The case does not meet the Rule 23A3 Typicality Requirement, the Rule 23A2 Commonality Requirement, and also fails under Rule 23B3 because individual issues predominate over common questions. The basic problem in a nutshell is this. The named plaintiff's testimony undermines rather than advances the class claim on the merits, making her not typical, and her testimony further establishes that the case depends on the resolution of highly individualized questions that make class treatment improper under Rule 23. In addition, instead of applying the rigorous analysis that Rule 23 requires, holding the plaintiff to the burden of proving each element of class certification before trial, the court below presumed that an element of Rule 23 was met and shifted the burden to defendant to rebut that presumption after a class-wide trial. Under the FDCPA, a debt collector is not permitted to send a communication threatening legal action that the creditor does not intend to make. There are thus two elements to the claim. Does the communication threaten legal action? And is the threat an empty one because the creditor has a policy against carrying out any lawsuits or other legal actions? Ms. Flecka seeks to certify a class consisting of all consumers who received a particular letter from MetaCredit, but she testified that nothing in the letter itself threatens legal action and that a representative of the creditor at issue, Seton Medical Center, advised her that it could take legal action against her in particular circumstances. Her own testimony thus eviscerates the claim. Ms. Flecka testified that the letter she received does not contain any language threatening legal action. At her deposition, she was asked, what is it you're testifying says there will be legal actions? She repeatedly agreed that she did not see anything in the plain text of the letter that threatened legal action. There is case law under the FDCPA regarding what type of language or what indicia might indicate a threat of legal action, and Ms. Flecka agreed that none of that language was present anywhere in the letter. Although in fairness, the letter says that voluntary resolution is doubtful, what's left? What's left after a voluntary resolution is doubtful? If voluntary resolution is not going to happen, then I assume what's left is involuntary. What's left after voluntary resolution is doubtful is two possibilities. One is that the consumer doesn't pay at all, which is in fact what Ms. Flecka's credit history shows was her common experience, and the other would be some kind of forceful action. So involuntary or abandonment. Involuntary or abandonment, and that's particularly relevant here because the corporate representative of MediCredit testified that MediCredit only conducts a voluntary payment program. If the consumer doesn't pay at the end of the six-month period that the account's been placed with MediCredit, MediCredit returns the account to the creditor, and the creditor thereafter has full volition to decide what they're going to do with the account. At what point can this deficiency be noted to the credit bureaus? At what point can it be reported to the credit bureaus? Yes. That would be up to the creditor to decide. So that would be involuntary, wouldn't it? Yes, but that would be, again, for the creditor to decide. I'm helping you out. I got you. It's another non-litigation inference. Exactly. Ms. Fleca does not and can't disagree that the law is clear that a named plaintiff who is subject to a defense that threatens to become a focus of the trial can't be typical under Rule 23. Here, if the case were to go to trial, MediCredit's Exhibit 1 would be Ms. Fleca's deposition transcript, and she would be a witness for the defense. Plaintiff's counsel's response is to claim that Ms. Fleca's testimony is irrelevant because the test for whether a communication threatens legal actions in the eyes of an unsophisticated consumer is an objective one, and Ms. Fleca's testimony was quote-unquote subjective. This misunderstands both the law and the distinction between subjective and objective. The test for whether an FDCPA communication threatens litigation is an objective one about what an unsophisticated consumer would perceive the letter to say. Ms. Fleca is indisputably an unsophisticated consumer. I mean, wasn't that the point of denying 12b-6 on this? To allow her to testify, exactly, Your Honor. Right. The letter was not on its face enough for the plaintiff to carry the burden of establishing that there was a threat of legal action. But what Ms. Fleca testified was not that the letter does not scare me into believing that Seton will take legal action, but that the letter does not contain identifiable language threatening anyone with legal action. The former would be subjective testimony. The latter is testimony about the objective interpretation of the letter coming from the only unsophisticated consumer we've ever heard from in the case. Plaintiff's theory that the interpretation of the letter by an unsophisticated consumer is irrelevant to the interpretation of the letter by an unsophisticated consumer leads to absurd and untenable results. Under plaintiff's view, if 12 or 100 or 1,000 unsophisticated consumers testified that the text of the letter does not threaten legal action, that would not tell you anything about whether the letter threatens legal action because each of their testimony could be dismissed as subjective. Unsurprisingly, that argument doesn't have any support in the case law and is even denied by the cases she cites, including the Seventh Circuit's decision in Chiu Way v. National Action. Ms. Fleca did have a genuine concern about being sued by a Seton Medical Center. Her concern, however, came not from the text of the letter, but from the combination of the letter with the conversation that she had with a representative of Seton. She testified that the representative told her that she would only be eligible for a payment plan if she made a lump sum payment and she did not feel that she could afford to. The representative told her that Seton might take legal action against her if she didn't enter into such a plan. In other words, Ms. Fleca testified that the letter can be read as threatening legal action only against a recipient who has had an additional communication with the creditor and who lacks the financial means to avail themselves of the offer of a voluntary resolution. But that creates a whole host of additional problems under Rule 23. First, it would require highly individualized inquiries into whether each class member had any additional communication with Seton and whether each class member had the means to make a down payment under a payment plan. Far from common issues predominating, individualized issues would engulf the case in a series of mini-trials. That proliferation of inquiries is not permissible under Rule 23b-3. An analogous case from the Western District of Washington explains the problem very clearly. Where there were multiple communications, the determination of whether and at what point and how an individual member was deceived cannot be reduced to a common question of fact, but will depend on case-by-case analyses incompatible with a class action mechanism. Plaintiffs contend that class-wide issues predominate because there is a single substantive issue that will control the outcome of each class member's claim, whether the letter contains a threat to sue. But that contention is irreconcilable with the Supreme Court's decision in Walmart Stores v. Dukes. The Supreme Court held that, quote, what matters to class certification is not the raising of common questions, even in droves, but rather the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation, close quote. Ms. Flecka's testimony reveals that interpretation of the letter will not generate a common answer because she conceded that a consumer would only perceive a threat under highly individualized circumstances. The district court said this, under the FDCPA, the proper inquiry is how the letter might be construed in the eyes of an unsophisticated consumer, not how the consumer actually perceived it. See Taylor. What is the Taylor case? The Taylor case is a case that embodies the objective standard applicable to the FDCPA. There have been a number of cases under the FDCPA because there's sometimes a tendency for lawyer plaintiffs to sue, where the plaintiff is sophisticated and therefore is aware, for example, that the debt is time barred and so there can't be legal action. But nonetheless, the communication to an unsophisticated consumer might communicate a threat of legal action. This is the reverse situation. This is an unsophisticated consumer testifying not about how she felt, because she actually was concerned, but her concern, as she testified, came not from the letter, but from what the representative of Seton had told her in this separate phone call. So you're saying that the Taylor case, which I don't think I reviewed, indicates was one of these time barred debt cases? I believe that's correct, Your Honor. I can grab it and on my rebuttal time tell you for sure. Fine. Ms. Fleca's testimony about her conversation with the Seton representative raises an additional issue that requires reversal of the certification order below. In an opinion that you authored, Judge Jones, in a case called Unger v. Amedesis, you underscored the necessity of a rigorous analysis under Rule 23 in order to comport with due process and emphasized that, quote, the plain text of Rule 23 requires the court to find, not merely assume, the facts favoring class certification. But the court below did exactly the opposite. The court recognized that a key issue was whether the letter contained an empty threat of litigation because Seton had a uniform policy that consumers would never be sued. And the court went on to say, quote, the court presumes for the purposes of class certification that Medacredit and Seton act consistently in determining whether to sue recipients of the letters. That's reversible error. The plaintiff bears the burden of establishing each element of Rule 23, and the court cannot presume away that obligation. That presumption is particularly unsupportable here because the plaintiff's own testimony was precisely the opposite of what the court presumed. She testified not only that she was told by a representative of Seton that Seton might sue her, but that Seton would make the decision on a case-by-case basis, depending on whether a charitable donor was available or the consumer could meet the terms of an acceptable payment plan. Far from a consistent plan never to sue, what Ms. Fleca testified to was an individualized policy of Seton reserving the right to take legal action in particular circumstances. The plaintiff had two responses to that, but neither works to rescue class certification. The first is an argument that Seton lied to Ms. Fleca. There is zero evidence in the record that Seton lied to Ms. Fleca. A plaintiff can't carry her burden under Rule 23 of proving X by introducing evidence of not X and then saying not X is a lie. Plaintiff claims that because the court's presumption was acceptable because it was supposedly an educated guess. Unsurprisingly, she doesn't cite any law in support of that argument, and an educated guess is no substitute for the rigorous analysis required by Rule 23. Moreover, the district court could not make an educated guess that was contrary to the facts in the record. Plaintiff's other response to this question is to attempt a bait-and-switch. Although the court and plaintiff recognize throughout the case that the relevant question is whether Seton Medical Center, the creditor, has a policy against suing consumers, plaintiff now asserts that the question is whether MediCredit, the debt collector, has a policy against suing consumers. MediCredit's corporate representative, as I mentioned, testified that MediCredit is engaged only to engage in voluntary collection efforts. Seton makes the independent decision of how to proceed from there, including whether to sue. MediCredit does not sue consumers on Seton's behalf and would have no standing to do so. It is not the creditor. Ms. Fleca does not owe MediCredit a dime. Her debt is to Seton Medical Center. The FDCPA question is whether the creditor, Seton, would sue. The complaint alleged that Seton does not sue consumers for medical debts. The magistrate's report and recommendation stated that the court finds that it is plausible that an unsophisticated consumer would interpret the letter to imply that Seton would file a lawsuit against Fleca if she did not pay her debt. At the end of the day, what Plaintiff's Counsel is really arguing for is essentially automatic certification of FDCPA cases. What you will hear him argue is that the class can be certified even if there are highly individualized issues regarding whether Seton would consider suing any particular consumer because there is one common question as to whether the letter threatens legal action. That misses the point under Dukes that it's whether there are common answers, not whether there is a common question. But it also proves too much. If it were accepted, every case involving a debt collector sending a letter could be certified. The district court, I'm sorry to say, adopted a similar approach. It said it was sufficient at this stage to identify the question as common to the class and capable of class-wide resolution. And it shifted the burden, saying that if MediCredit proves to the contrary at trial, then the court will reconsider its decision to certify the class. That's inconsistent with Rule 23, and we ask the court to reverse the order. All right. Thank you, ma'am. Thank you. Mr. Zimmer? Are you with the law firm from Chicago? I am not. I have a solo firm in Austin. My name is Robert Zimmer, and I represent the appellee Nina Fleca. Were you involved in the Talamore case? I was not. I wondered if the group in Chicago have something against Seton Hospitals. I'm familiar with that case, but, no, I was not a participant. May it please the court, I think that MediCredit is overcomplicating a very factually and conceptually simple case. The facts of the case and the dispositive issues left, which are only two, that the district court has basically referred to the jury, those are very simple. From a class certification perspective, this is also a very simple case. There is a very cleverly written letter here that was sent to 7,650 people, all of whom owed medical debt and couldn't pay it, to Seton Hospital. And I'd like to point out some language in this letter that I think will be helpful in the analysis of whether or not the district court, you know, did not sue customers. The letter in the language is as follows. At this time, a determination must be made with our client as to the disposition of your account. As Judge Ho pointed out earlier, it says, you notice, your failure to cooperate in satisfying this debt indicates voluntary resolution is doubtful. So what happened was Judge Yackel, the district court judge, he didn't presume that MediCredit and Seton don't sue customers. Judge Yackel inferred this from the record. That's just an inartful use of words, eh? How can you take the position with a straight face, on the one hand, that the letter threatens litigation, and on the other hand, it proves that Seton had no intention? That was not what I was trying to argue, Your Honor. Well, I know, but that's the inconsistency I see. I understand, Your Honor. So I think the point that I was trying to make is that the record supports the contention that Seton, the creditor, and MediCredit, the debt collector, work in concert. Sorry, Your Honor, go ahead. Go ahead. The deposition testimony of MediCredit's senior vice president for collections, either vice president or senior vice president, excuse me, also discusses in detail how MediCredit, the debt collector, works with Seton. So I don't think it was a presumption at all that Judge Yakel concluded, again, from the record, that the debt collector and the creditor were speaking with one voice here. Is opposing counsel correct that your client has conceded, that the class rep has conceded that the letter is not what she perceives as a threat to Sue? I don't concede that. I think actually a full reading of the deposition in context shows that the first thing that happened is she went to the hospital. Then she was discharged. She went to the billing department. She told them she couldn't afford to pay the debt. And they said, well, you better think about that, basically. Long story short, they said you better think about that because we may consider taking extra steps after that. So what happened then is she received this letter, as did all 7,650 members of the putative class here. And so what the deposition testimony shows, her deposition testimony shows is that when she received the letter, she was frightened. So it was not sorry, Judge. Well, I don't think there's a way to reconcile what the both of you are saying. I think the idea is the letter read in context of these previous verbal and person conversations is what caused Ms. Flaca to think that she was being threatened. I think that's a plausible reading of the deposition. Isn't that a perfect example of individualized evidence? You've got to look at other conversations. Well, but see, again, I think this is why the question to me, what MetaCredit is functionally asking for is that we pull the tapestry on the regarding a deceptive letter, make it a subjective thing where we have to inquire about the debt. I don't think that's true. It depends on how the plaintiff and the class present the case. It's an objective standard. I fully get that. Nobody seems to dispute that that's a standard or the substance of law. The question is what evidence are you presenting? It sounds to me like you're presenting a combination of a letter that everybody got, that's common, and conversations that would be, by definition, individualized. Well, I don't think the individualized predicate conversations, if you will, are relevant. Again, the only inquiry is whether — Didn't Ms. Flaca say that they're relevant, if not dispositive? I don't believe that, again, I don't think the full context of the deposition testimony, I don't think she concedes that it's dispositive. I think she was confused by a lot of the legalese flying around. Well, if it's not, you know, A, why didn't the district court just haul off and grant summary judgment if this unequivocally threatened suit and Ms. Flaca's testimony is irrelevant? B, the Chiu A case out of the Seventh Circuit has Judge Posner saying that this question about what the letter threatened was — but if it is unclear, then to make out a prima facie case, the plaintiff has to go further and present evidence beyond her own say-so of confusion, for example, in the form of a carefully designed and conducted consumer survey. And it also says plaintiff testifies credibly that she was indeed confused. So, I mean, there is a big role for testimony, and indeed for further evidence about the possibility of confusion and misunderstanding. Well, you know, let's game out the scenario. If, for example, if the panel were to overturn the class certification — Then Ms. Flaca would go to trial for herself, as Ms. Tallamore tried to do. Well, but what I think also is possible is that if, you know, the circumstances of the remand could be that the panel asked the district court to look again at what comprises the class. So I don't think the remand necessarily means that you just immediately go to trial with a single plaintiff. And so, to me, the natural consequence of not seeing the conceptual simplicity of this case and then denying, or rather overturning the class certification, is that you actually get exactly what Metacredit's counsel described, which is you have dozens, maybe hundreds, maybe thousands of cases at the district court level, all of which would turn on the individual consumer's subjective interpretation of the letter. And it's just a much more — Right, so my point is — No. I don't know the answer to that. What we do know is that the debt collector is using the exact same script in the form of the letter that they sent to everybody. Not to my knowledge. Yes. Yes. And so my point is this, is that, again, it's just a much more economical use of judicial resources if you have one trial about one letter that every single member of the class received. So bring in 7,650 people to testify about how they interpreted the letter. Is that practicable? Not at all. No. Let me add, I think the problem with your case is this. It is one thing to have a debt collector violate a specific prohibition in the FDCPA, which, since the law has been in existence for 40 years, is rarely going to happen. What is at issue, except in these cases like the time-barred debts or whatever, and I don't think that's even definitively decided yet, not in this circuit. So the question here is inherently individualized in the terms of threat. And since no debt collector who is not a moron would say, if you don't pay, we're going to sue you, then they use different language. They use different language in the Talamore case. They use different language in this case. This is not likely to be voluntarily resolved. Do not ignore this notice. Well, exactly. And then it becomes an individualized question as to what is perceived as a threat. Well, I guess I respectfully disagree, Your Honor, because I believe the case law is really clear. Again, if you pull, I think at a certain point you pull the threat on the tapestry and then the whole FDCPA starts to come apart. No, it only comes apart as to things where the question of violation becomes in the interstices or something less than an outright prohibition in the statute. And the Seventh Circuit had the, I forget whether it was the Chueh case. I think it was the Chueh case about how did it represent the debt. Did that representation about the amount due properly tell the consumer that, in fact, we're going to charge you interest and attorney's fees? And they said no, the plain language. Everybody said the bench is confused. Everybody's confused. Well, so I think here, the risk of stating the obvious, the district court looked at this, both the merits of the case and the class certification issues of the case. The magistrate reviewed a motion to dismiss, denied it. The district court judge also took a very careful look at the record. And at the end of the day, both parties had duly motions for summary judgment. So at the end of the day, the judge said the case law is clear. Whether a collection letter is deceptive or not is a question of fact for the jury in this case. And so to me, if you get that. But he also said her testimony is not relevant, but it is highly relevant. Well, again, the testimony of Ms. Fleckall, all that does is give an insight into her state of mind and into her impression. I mean, she's an unsophisticated consumer, isn't she? Yes, but again, the point of the unsophisticated consumer standards, it's supposed to protect everybody from the gullible to the shrewd. It is a strict liability statute. So she's a shrewd, unsophisticated consumer? No, not at all. No, she's not even a gullible, unsophisticated consumer. She was just a consumer who didn't understand, but she thought, hmm, I better call the hospital. Which is what that letter was designed to provoke. Well, if I remember the sequence of events correctly, actually, Your Honor, her visit with the hospital billing department came prior to receiving the letter. My recollection of the deposition testimony of Medacredit's employee is that the collection letter in question is sent as the nuclear option. It's the last thing they do before Medacredit gives up and returns the account to Seton. And by the way, just to point out, Medacredit's representative concedes that they never sue consumers ever. Well, they don't own the debt, so that is totally, that is sophistic on your part. Well, they could be, they could, with the authority of their client, they could be assigned the responsibility. But that's not what they do. That's not what the business is. So get off it. That is totally sophistic. I understand, Your Honor. So, again, my point is that I believe that they're asking us to completely, Medacredit, that is asking us to completely discard the purpose of the unsophisticated consumer. Because, again, for example, there's a case from the Ninth Circuit, and I believe we briefed it. I can't remember the name right off the top of my head, but the conclusion was this on this very particular issue. There was a letter that was alleged to be deceptive. The consumer testified in his deposition that he was not misled by it in the slightest. And the district court certified the class regardless of the fact that, on the record, this particular consumer said, nope, I wasn't confused by it. Now we're in a very different situation where it appears the consumer was deceived and felt threatened and felt that a lawsuit was coming based on the letter. And so, again, our argument is that... Based on the letter alone? I'm sorry? Based on the letter alone or based on the letter plus individualized... You're stipulating that it's not. Well, but I don't think an inquiry as to the predicate circumstances behind the letter is relevant as to whether the letter is violative, nor do I think that it's relevant for the purposes of class certification. To be clear, it's up to plaintiff and class counsel to determine the strategy. I just have understood that the strategy you all have chosen is that it's not just the letter, it's the letter plus. We did not, if you look at the complaint, we did not allege anything except that the letter was sent to our client and the letter was deceptive because it threatened litigation that was never going to come. We did not allege anything about any predicate conversations or anything of that sort. Again, it's very factually simple. What about your summary judgment in class cert papers? In other words, are you consistently saying it's just the letter? I believe so. Just to be clear, today you're actually being inconsistent. You're saying today it's not just the letter, it's the letter plus individualized conversations. What I'm saying is that I'm acknowledging what happened in the deposition. That's all. What I'm not acknowledging is that in our complaint, that we alleged a predicate conversation with Seaton or any other facts at all. The complaint simply alleges nothing more and nothing less than the letter itself was deceptive and threatened the lawsuit. Thank you for the clarification. What you're acknowledging is that the deposition says it's not just the letter, it's the letter plus these conversations. I don't concede that, but I believe that, to be fair, a plausible reading of the deposition testimony is that. Again, all the complaint alleges is that the letter was deceptive. The complaint did not allege that the letter is deceptive because of her conversation with the hospital. That is not what the complaint alleges. I don't see attention. In that sense, I suppose, your complaint says the letter is deceptive and the deposition explains what that means. It's that the letter is deceptive because of those conversations, because of the context. I think our argument is that regardless, the letter is deceptive, even unmoored from a context of that conversation, alleged conversation in the deposition. I think even unmoored from that. What class certification evidence do you have that the letter alone, without any conversation, is objectively deceptive? Objectively threatening to sue. I think the particular combination of the three or four statements in there. It says, first of all, at this time, a determination must be made with our client as to the disposition of the account. Your failure to cooperate in satisfying this debt indicates voluntary resolution is doubtful. And then later on, in very big letters, on the collection letter, it says, do not ignore this notice. We discussed earlier that there are three inferences to this. One, abandonment. Two, litigation, your point. And three, not litigation, but a referral to the credit bureau. And so again, I think what we're saying here is it's left for a question of a jury. And to me, a jury poll is a great way to determine whether or not a letter is deceptive or not. That's sort of the point. And so I think all you need at all, really, is the letter itself, and then the deposition testimony from MediCredit's employee, in which he unequivocally states, we do not sue consumers ever for debts. Do you have a similar statement from Seton? There is no evidence in the record, if I'm not mistaken, at all. In other words, Seton is completely silent on this topic. Well, Seton, it's the creditor who has no intent to sue under the statute. I mean, legally, it is only the creditor. Well, Your Honor, I believe the text of the statute under FDCPA section 1692E5 says it prohibits the debt collector from making a threat that it has no intention of carrying out. It doesn't say anything about the creditor. Well, you're saying they're working together. You said they're working together. It is only Seton that can file the lawsuit. And therefore, under the fact here, it is only Seton's intent that one looks to. And, of course, the judge, quote, presumed that. Well, I don't think the judge presumed that. Well, that's what he said, and you said there are facts that underlie the presumption. That is my argument. Again, the deposition testimony, I think, again, in context makes it very clear that not only does the debt collector not ever sue anybody, but I think it's not an unfair reading of that testimony to conclude from that that Seton doesn't either. I don't understand your argument on that score. Well, put another way. So I've repeated. You didn't depose Seton. You only deposed MediCredit, correct? That is correct. We can certainly, at trial, we could call somebody from Seton. We could also ask the court to take judicial notice of the fact that there is not a single case filing that I'm aware of in the past five years where Seton has sued anybody for a past due medical debt. Well, maybe they sued him in Williamson County. Your records were Travis County, right? I checked Williamson, Hayes, and Travis County, Your Honor. But Judge Yackel didn't find that persuasive, nor did the judge in the Talamore case. Different letter, different language in the letter. But the judge in the Talamore case said there's no evidence that Seton doesn't sue. I understand that. But again, I think that in the Talamore case, there was no deposition, as there is here, where you get a pretty It was a summary judgment. I understand. But what there wasn't in that case was deposition testimony from the debt collector that explained very thoroughly that their policies and procedures were never to sue consumers. All right. Thank you, Your Honors. I'm a little shorter than Mr. Zimmer. I wanted to read to you the full text that's relevant in the letter, because counsel stopped before two key sentences. He read the part that says, At this time, a determination must be made with our client as to the disposition of your account. Your failure to cooperate in satisfying this debt indicates that voluntary resolution is doubtful. That's where he stopped. But the letter then goes on to say, Judge Jones, you had asked about the Taylor case out of the Fifth Circuit. I actually confused it with a Southern District of California case called Gonzalez. But you mentioned that only a moron would send a letter threatening explicitly to sue when they had no intention of suing. And unfortunately, the defendant in the Taylor case was that moron. Because the letter in question appears on attorney letterhead. It says, I want you to understand how serious this is. Although the balance due, which was $78, is not that large an amount. After I file this suit and take a judgment against you, you are going to have to repay the $150 suit filing fee, which it is going to cost to file this suit. You can see the distinction between that letter and the one at issue here significantly. The case involving a sophisticated consumer who was not barred from representing a class of unsophisticated consumers is Gonzalez v. Arrow Financial Services out of the Southern District of California. But that case has nothing to do with this case. Ms. Frecka, everyone agrees, is an unsophisticated consumer. And what counsel is suggesting is that even though this unsophisticated consumer has given us what she believes is her interpretation of the letter, that is irrelevant. And the claim should either be put to a judge or a jury instead on a class-wide basis. That just defies evidentiary law. It can't be that the testimony of the only unsophisticated consumer heard from in the case is irrelevant to the interpretation of the letter by the unsophisticated consumer. The FDCPA case law cautions against more sophisticated people like judges and lawyers, substituting their judgment and understanding of a letter for that of the unsophisticated consumer. But that's absolutely not what happened in the case. There was absolutely no ambiguity in Ms. Frecka's testimony about what it was that raised her concern. She was asked, for example, she said, I believe if you don't pay within a proper time, they can take legal action towards you or they can garnish your wages. That's what I was understood of the situation. I said, have your wages ever been garnished by any of your creditors? No, ma'am, but they have been threatened. Does this letter say garnishment or wages anywhere in it? No, ma'am, but when I did contact the seat and they discharged, they said those are actions they may take up. They can, I believe, garnish wages, she said, if I don't come to an agreement with payment. And since I did not get approved for the charity baskets, that was no longer my option. Question, okay, so is it your testimony that you read this letter in light of your conversation with the representatives of seat and medical center Hays? That I read it with them? No, that you read the letter having in mind that you had these conversations with representatives of the medical center. Okay, thank you. We can read. I'm wondering about the, you have the Samuel case which they cited for the proposition that a letter that referred to involuntary resolution could be read in the mind of the unsophisticated consumer to include possible involuntary garnishment. And the case went forward. How many class action cases are there, because the brief cited a welter of cases, how many class action cases are there that involve this implicit threat to sue? Oh, gosh, I don't know that I could answer that question. I think under the FDCPA, each letter has to be addressed on its own terms. I know, but how many courts have certified class actions where the letter was plausibly an implicit threat to sue? Not an explicit, but implicit. I don't know the answer to that. There can be circumstances where even though the letter isn't as terrible as the one in Taylor that I read to you, that it does contain an implicit threat to sue. I guess what I'm saying is, and maybe I should have asked Mr. Zimmer, and I'm sure it's in your briefs, if it's anywhere. So you're acknowledging there probably are some cases that treated implicit threat to sue letters as a basis for class actions. Well, let me say two things. He's nodding his head, so he can file a 28. That's true, but the threat, remember, has to be an empty one. There's no bar against a creditor or a debt collector threatening action because they're entitled to collect the debt. That's where this case also falls apart, so even that alone doesn't rescue the class action here. Thank you, Your Honor.